USDC SCAN INDEX SHEET

















KAJ    12/22/05    15:45

3:05-CV-02299   PURE BIOSCIENCE V. FALKEN INDUSTRIES

*1*

*CMP.*

Charles E. Brumfield, CSB #56636
1725 Gillespie Way
El Cajon, CA 92020
Tel: (619) 596-8600 x138
Fax: (619) 596-8790

Attorney for PURE

FILED

05 DEC 16 PM 2: 34

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

PURE BIOSCIENCE, a California corporation
f/k/a Innovative Medical Services,

                                   Plaintiff,

vs.

FALKEN INDUSTRIES, LTD.,
a New Jersey corporation,

                                   Defendant.

CASE NO. '05 CV 2299   WQH BLM

COMPLAINT FOR DAMAGES AND FOR
DECLARATORY AND INJUNCTIVE
RELIEF

ORIGINAL

Plaintiff Pure Bioscience, a California corporation f/k/a Innovative Medical Services (hereinafter "PURE") states as follows:

1.      PURE is a public company whose shares currently trade on the OTC Bulletin Board under the stock symbol: "PURE." The principal place of business of PURE is in the Southern District of California at 1725 Gillespie Way, El Cajon, California.

2.      PURE is informed and believes and thereon alleges that defendant Falken Industries, Ltd., a New Jersey corporation (hereinafter "FALKEN") was duly organized on or about 6 August 2003, existing pursuant to the laws of the state of New Jersey and claiming its principal place of business to be 146 rue du Chateau, Paris, France.

3.      This Court has diversity jurisdiction over defendant under 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of

1

Complaint

1  interest and costs.  Venue is proper in this district in that FALKEN is in the process here of litigating

2  its rights under the applicable Axen License Agreement, and otherwise.

3      4.    On or about June 23, 2004, PURE filed a Statement of Claim with the American

4  Arbitration Association in San Diego, California (AAA No. 50 133 T 00319 04), seeking damages

5  against Nickel, Ltd, a New Jersey corporation (hereinafter "NICKEL") as the claimed signatory

6  under the Axen License Agreement and FALKEN as the asserted assignee of NICKEL's rights

7  thereunder.  The Axen License Agreement is appended hereto as Exhibit "A," and incorporated here

8  by this reference.

9      5.    Arbitrator L'Estrange was appointed by the AAA to preside over the referenced PURE

10  arbitration NICKEL and FALKEN.

11      6.    NICKEL and FALKEN were both represented by Attorney Michael Rovell in the

12  L'Estrange arbitration, and neither party therein would agree to abide by the applicable dispute

13  resolution clause.  NICKEL and FALKEN both took the position that NICKEL had never signed the

14  Axen License Agreement, and that it was a mere form to a larger agreement (i.e., the "Umbrella

15  Agreement").

16

17      7.    PURE petitioned the federal court for an order compelling NICKEL to arbitrate the

18  pending dispute.  At or about the time of the petition naming only NICKEL, there was discussion

19  between PURE's counsel Charles Brumfield and therein respondents' counsel, Michael Rovell, that if

20  NICKEL were determined to be held accountable by the federal court to sit for arbitration, Attorney

21  Rovell would advise his client FALKEN to similarly sit for the L'Estrange arbitration.

22      8.    On September 30, 2005, Judge Lorenz granted PURE's petition to compel NICKEL to

23  arbitrate the Axen License Agreement disputes before Arbitrator L'Estrange.  Nevertheless,

24  FALKEN has refused to abide by the arbitration clause, and indeed NICKEL has purported to file an

25  interlocutory appeal challenging the order to arbitrate and has moved the Court to "stay" the pending

26  arbitration against it.

27

28

2

Complaint

9.     Faced with FALKEN's refusal to arbitrate and to avoid the interminable delays of justice which PURE has faced with FALKEN's prior exploitation of "loopholes" in the arbitral systems of the FAA and AAA, PURE determined (with prior notice to Arbitrator L'Estrange and opposing counsel) to seek its remedies directly with this federal court.  Accordingly, PURE will continue with the related and ordered arbitration against NICKEL, and will concurrently proceed with the claims against FALKEN in this action.  If FALKEN should forthwith agree to have the below claims submitted to Arbitrator L'Estrange to be heard in the currently scheduled NICKEL hearings, PURE would agree to arbitrate the below claims with FALKEN.

10.    PURE is informed and believes and thereon alleges that NICKEL, a New Jersey corporation is now controlled, dominated and operated by defendant FALKEN (through primary principal Emile Gouiran, hereinafter "GOUIRAN") in that all the activities and business of NICKEL are now being carried out by FALKEN and the same principals, shareholders, directors and officers involved in NICKEL now are the same principals, shareholders, directors and officers that are involved with and control FALKEN.  Defendant FALKEN, non-party NICKEL and non-party GOUIRAN are alter egos one to another, and with respect to the claims of wrongdoing hereinafter are joint tortfeasors, agents of one another, and co-conspirators.  All distinctions among GOUIRAN, defendant FALKEN and non-party NICKEL have ceased to exist, and in fact GOUIRAN regularly ignores any corporate formalities and/or separateness, and instead uses these and other shill corporations to do his will and conduct his tortious actions.  At all times herein mentioned, PURE alleges through information and belief that defendant FALKEN has been inadequately capitalized, maintained a unity of ownership and control with NICKEL, has failed to maintain corporate formalities, utilized the same officers, personnel, communication channels and legal counsel as NICKEL and GOUIRAN, operates from a common address, does not operate in the "ordinarily course," but rather as a mere instrumentality of the agenda of GOUIRAN, commingles and transfers assets between or among itself and NICKEL / GOUIRAN (or other shill companies such as NVID), and otherwise acts in improper ways such that any legitimate distinctions between or among

3

Complaint

1   defendant FALKEN, non-party GOUIRAN, and non-party NICKEL have ceased, and indeed to

2   recognize such purported distinctions or separation would promote fraud and injustice.  GOUIRAN

3   uses Defendant FALKEN and NICKEL as his own personal piggybank(s), and to shield his true

4   worth and business interests from the victims of his ongoing breaches of contract and torts.

5           11.     In January of 2003, PURE entered into the Axen License Agreement with NICKEL.

6   Pursuant to the Axen License Agreement, PURE, "as the owner and/or assignee" of the Axenohl®

7   patent and its related technology [collectively the "Licensed Technology"] granted to NICKEL

8   certain "non-transferable limited licenses for the Licensed Technology and the respective Licensed

9   Products," permitting NICKEL, on a non-exclusive basis "to use, sell and market the Licensed

10  Technology" in a specifically defined Licensed Territory. *Exh. A, Axen License Agmt.*

11          12.     In return for PURE's grant of these licenses and as consideration for the rights

12  conveyed, NICKEL agreed to pay to PURE a licensing fee in the amount of:

13

14                  "THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable

15                  over a period of eighteen (18) months, in twelve (12) equal monthly

16                  installments in the amount of $25,000.00 USD, commencing on the

17                  seventh (7th) month from the anniversary date of the execution of the

18                  Agreement and continuing on a successive monthly basis through the

19                  eighteenth (18th) month from the anniversary date of the execution of this

20                  Agreement."

21                                                           *p. 3, Exh. A, Axen Lic. Agmt.*

22          13.     In addition to the payment of the licensing fee, NICKEL contractually obligated itself

23  to take the following actions (among others):

24                  (a)     "launch and market, on a commercially acceptable basis, at least one product

25                          in each Minor Field of Use within six months of the execution of this

26                          Agreement; *p. 3, Exh. A, Axen Lic. Agmt.*

27

28

                                                    4

                                            **Complaint**

(b) "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing *the specific needs of each Minor Field of Use within one year*"; *p. 3, Exh. A, Axen Lic. Agmt.*

(c) "on a best efforts basis" to "use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Axen Lic. Agmt.*

(d) ". . . spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Axen Lic. Agmt.*

(e) ". . . report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Axen Lic. Agmt.*

(f) " . . . provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail "the customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months" with "certification from its Chief Financial Officer. . . " *p. 4, Exh. A, Axen Lic. Agmt.* and

(g) "honestly, faithfully and *strictly* comply with all applicable federal, state and local laws", including securities laws. *p. 3, Exh. A, Axen Lic. Agmt.*

14.     The Axen License Agreement expressly provides that it or any part thereof "may not be transferred or assigned by (NICKEL) without the written consent of [PURE]." *p. 9, Exh. A, Axen Lic. Agmt.*

15.     On or about 25 September 2003, PURE was informed on FALKEN letterhead by Ms. Helle A. Madso (NICKEL's Vice President and FALKEN's Executive Vice President) that NICKEL's rights, title and interest under the Licensing Agreement had been fully and completely

5

transferred and assigned to FALKEN and that FALKEN was the "assignee of Nickel, Ltd." as to all of NICKEL's rights under the License Agreement. (Falken letter of 25 September 2003, Exhibit "B" hereto).

16.     Shortly after, through a publicized Press Release, PURE discovered that FALKEN had "recently acquired the Clean Plus® product group (http://www.cleanplus.com)" and was now touting itself as "the leading manufacturer of high quality and innovative wet wipe specialty cleaning products in Europe." In addition, PURE further discovered, through a "stock purchase solicitation" correspondence dated 13 October 2003 again promulgated by Ms. Helle Madso, NICKEL's Vice President and FALKEN's Executive Vice President, that FALKEN: (i) "(wa)s a dynamic consumer and industrial goods manufacturer with a leading role in the market for innovative wet-wipe technology and time-tested marketing know-how for cleaning and hygiene products and accessories; that (ii) "FALKEN (had) recently acquired all of NVID's rights to the patent Axenohl® and that on August 28, FALKEN acquired from Nickel, Ltd. the Clean Plus® branded product group,(which) includes the Bac'Out® line of cleansing and disinfectant liquids and wet-wipes in which Axen®, the Axenohl® derivative will be incorporated," and that (iii) "FALKEN fully expects to be producing and marketing its full line of Clean Plus® products, including the Bac'Out® products using Axen® in both North America and Europe no later than first half 2004."

17.     PURE is informed and believes and thereon alleges that FALKEN is legally responsible for NICKEL's obligations under the Axen License Agreement  pursuant to at least the following theories:

(A)     FALKEN is the purported assignee of the Axen License Agreement, and thus is liable for the obligation therein;

6

Complaint

(B)   FALKEN has accepted the benefits of the Axen License Agreement, and thus is liable for its "burdens";

(C)   FALKEN is judicially estopped because of prior litigation positions from denying the obligations under the Axen License Agreement; and

(D)   The circumstances of the creation of FALKEN and the transfer of NICKEL asserts into FALKEN affect a *de facto* merger such that FALKEN is responsible for the obligations of the Axen License Agreement.

# FIRST CAUSE OF ACTION

**(Breach Of Contract: Failure To Pay Licensing Fee And Failure To Comply With Various Contractual Obligations)**

18.   PURE realleges and incorporates herein by reference each and all of the allegations set forth in paragraphs 1 through 17, inclusive.

19.   On or about 10 January 2003, PURE and NICKEL entered into the Axen License Agreement.

20.   In consideration for rights received in the Axen License Agreement, NICKEL agreed to pay to PURE a licensing fee in the amount of:

"THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable over a period of eighteen (18) months, in twelve (12) equal monthly installments in the amount of $25,000.00 USD, commencing on the seventh (7th) month from the anniversary date of the execution of the Agreement and continuing on a successive monthly basis through the eighteenth (18th) month from the anniversary date of the execution of this Agreement."

*p. 3, Exh. A, Axen Lic. Agmt.*

21.   In addition to the payment of the licensing fee, NICKEL agreed to take the following actions (among others):

7

Complaint

(a)   "launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement; *p. 3, Exh. A, Axen Lic. Agmt.*

(b)   "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year"; *p. 3, Exh. A, Axen Lic. Agmt.*

(c)   "on a best efforts basis" to "use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Axen Lic. Agmt.*

(d)   ". . . spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Axen Lic. Agmt.*

(e)   ". . . report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Axen Lic. Agmt.*

(f)   " . . . provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail "the *customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months*" with "certification from its Chief Financial Officer. . ." *p. 4, Exh. A, Axen Lic. Agmt.*

(g)   "honestly, faithfully and strictly comply with all applicable federal, state and local laws", including securities laws. *p. 3, Exh. A, Axen Lic. Agmt.*

(h)   "LICENSEE will not, during or after the term of this Agreement, adopt any *trade name, trademark, service mark or logo, which is similar to or likely to be confused with any names or marks used by INNOVATIVE . . ." p. 5, Exh. A, Axen Lic. Agmt.*

8

(i)    "LICENSEE agrees to maintain the Licensed Technology in confidence and to use the same only in accordance with the Agreement. . . ." *p. 7, Exh. A. Axen Lic. Agmt.*

(j)    "LICENSEE is required to ensure that INNOVATIVE shares in the results of the testing for new products.  Specifically, INNOVATIVE will be included as a beneficiary on all reports from testing laboratories destined for product support or regulatory approval." *p. 2, Exh, A, Axen Lic. Agmt.*

22.    FALKEN has breached the express terms of the Axen License Agreement in at least the following ways:

(a)    Failing to commence and make payment of the licensing fee in the amount of $300,000.00;

(b)    Failing to "launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement;" *p. 3, Exh. A, Axen Lic. Agmt.*

(c)    Failing to "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year"; *p. 3, Exh. A, Axen Lic. Agmt.*

(d)    Failing to utilize "on a best efforts basis" all "expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Axen Lic. Agmt.*

(e)    Failing to "spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Axen Lic. Agmt.*

(f)    Failing to "report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Axen Lic. Agmt.*

(g)    Failing to "provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail

9

1   "the customer and number of Licensed Products sold and distributed during the

2   preceding three (3) calendar months" with "certification from its Chief

3   Financial Officer. . ." *p. 4, Exh. A, Axen Lic. Agmt.*

4   (h)   Failing to "honestly, faithfully and strictly comply with all applicable federal,

5   state and local laws", including securities laws. *p. 3, Exh. A, Axen Lic. Agmt.;*

6   (i)   Receiving a purported assignment of rights under the Axen License Agreement

7   from NICKEL "without the written consent of [PURE]," and indeed as part of

8   a fraudulent conveyance. *p. 9, Exh. A, Lic. Agmt.*

9   (j)   Adopting as its own a trademark for Axen in Europe. *p. 5, Exh. A, Axen Lic.*

10   *Agmt.*

11   (k)   Failing to provide PURE with test results purportedly conducted in Europe. *p.*

12   *2, Exh. A, Axen Lic. Agmt.*

13   (l)   By utilizing PURE's confidential information for purposes other than allowed

14   under the Axen License Agreement (including but not limited to on

15   information and belief commencing development and marketing AG+ in

16   breach of the patent and other intellectual property protection included in said

17   agreement). *p. 7, Exh. A, Axen Lic. Agmt.*

18   23.   PURE has performed all conditions, covenants and promises required to perform on

19   its part pursuant to the terms of the Axen Licensing Agreement, except for those legally excused by

20   FALKEN's material breaches and fraud.

21   24.   By reason of the above-described breach of contract, PURE has been damaged and

22   suffered losses in excess of Three Hundred Thousand Dollars ($300,000.00), the exact amount of

23   which shall be the subject of proof at trial.

24   25.   The Axen Licensing Agreement expressly provides that:

25   "In the event that it becomes necessary to initiate legal proceedings by
either party to enforce any of the terms or provisions of this Agreement, to

26   recover damages, or to obtain any relief, at law or in equity, the prevailing

27   party shall be entitled to recover, in addition to any relief afforded or

28

---

**Complaint**

obtained in such proceeding, reasonable attorneys' fees and costs as well as any court costs incurred by such party in connection therewith."

26.     As a direct result of FALKEN's breaches, PURE has been compelled to engage lawyers to prosecute the instant action. PURE is entitled to its reasonable attorney's fees, costs and expense in connection therewith.

## SECOND CAUSE OF ACTION
### (Breach Of Contract: Failure To Pay For Axen®)

27.     PURE realleges and incorporates herein by reference each and all of the allegations hereinabove set forth in paragraphs 1 through 26, inclusive.

28.     During or about January 2003, NICKEL submitted its order for the shipment and delivery of thirty-two (32) 55-gallon drums (approximately 1,760 gallons) of Axen® 30 to claimant PURE.

29.     Pursuant to the terms of the Axen License Agreement, NICKEL agreed to pay to PURE the sum of $27,520.00, plus freight and shipping costs, for its shipment and delivery of thirty-two (32) 55-gallon drums of Axen® 30 ordered by NICKEL.

30.     On 20 January 2003, PURE caused the thirty-two (32) 55-gallon drums of Axen® 30 to be shipped from San Diego, California for delivery to NICKEL, arriving at Le Havre, France on 28 February 2003, receipt of which was subsequently acknowledged by NICKEL on 24 March 2003 by NICKEL's representative Neil Spivey.

31.     Commencing in February 2003 and continuing to the present, NICKEL breached the terms of the Axen License Agreement by failing to pay the entire outstanding invoice amount due of together with shipping and freight charges in the amount of $2,745.01. FALKEN has become liable for this Axen License Agreement obligation upon the theories heretofore listed.

11

Complaint

32.   By reason of the above-described conduct, PURE has been damaged in the principal sum of $27,520.00, plus shipping and freight charges in the amount of $2,745.01, together with interest on the unpaid amount at the rate of $8.40 per day from February 28, 2003 to present, and according to proof at the trial hereof.

33.   PURE is entitled to its reasonable attorney's fees, costs and expense in connection herewith.

## THIRD CAUSE OF ACTION
### (Injunctive Relief)

34.   PURE realleges and incorporates herein by reference each and all of the allegations hereinabove set forth in paragraphs 1 through 33, inclusive.

35.   As part of a conspiracy to defame PURE entered into among FALKEN, NICKEL, GOUIRAN and others, FALKEN[1] initiated a continuous barrage of publicly disseminated postings of intentionally false, misleading and disparaging statements intended to cause damage to PURE. The conduct was designed to cause PURE to cease business such that FALKEN could seize ownership and/or control of the Axenohl technology or, alternatively, FALKEN and NICKEL could by coercion extract favorable terms for the settlement of the herein disputes. Some examples of these libelous postings are:

(a)   INNOVATIVE is "hovering on the threshold of bankruptcy";

(b)   "FALKEN INDUSTRIES LTD... also acquired from NVID International Ltd NVID:OTC all of its interest in the Axenohl® patent, concentrate for the Axen product solution"; *[12 Oct. 2003 (Yahoo!Finance # 4181];*

---

[1]   Without doubt and per his admission under oath in a prior arbitral hearing, these postings were initiated by Emile Gouiran under either *nom de plume*: nickelinfo (Yahoo!Finance) or nickel-dispatches (Lycos/Raging Bull).

Complaint

(c)   "FALKEN . . . acquired contractual rights and exclusivities, non-competition agreements and other similar privileges as against IMS who is consequently barred from marketing Axen in Europe as a whole and in the United States, except as a component of Clean Plus®' Bac'Out® line of disinfectants";

(d)   "Now while the patent was assigned to IMS in the "Core Settlement Agreement", NVID reserved to itself substantial rights, including that of recovering the patent. IMS is in serious violation of a number of provisions in that contract" *[24 Oct. 2003 (Lycos/Raging Bull # 9365)]*;

(e)   ". . . IMS has forfeited its rights to the patent, that patent subsequently reverts back to FALKEN under the Core Agreement. Hence as of this day[2], FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent and all derivatives (judicial determination is being prepared);" *[24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(f)   "FALKEN owns the Axenohl® Patent and all Axen derivatives. . .;" *[25 Sep. 2003 (Raging Bull Message Board Posting # 9374)]*;

(g)   "FALKEN has the unqualified absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)"; *[25 Sep. 2003 (Raging Bull Message Board Postings # 9374 & # 9392)]*;

(h)   "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world . . . "; *[21 Sep. 2003 (Raging Bull Message Board Posting # 9315)]*;

---

[2]   Statement was posted on "Raging Bull" PURE Message Board on 25 September 2003.

**Complaint**

(i)   "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com; *[24 Sep. 2003 (Raging Bull Message Board Posting # 9365);  25 Sep. 2003 (Raging Bull Message Board Posting # 9374 & Posting # 9392)];*

(j)   "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) facility as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories"; *(12 Oct. 2003 (Raging Bull Message Board Posting # 9632);* and

36.   PURE is informed and believes and thereon alleges that unless immediately enjoined, FALKEN fully intends to continue to commit similar acts to those outlined hereinabove, and thereby will continue to directly interfere with, and wrongfully mislead the public as the true ownership of PURE's Axenohl® patent and license rights.  Accordingly, assets and property of PURE are in danger of being materially and irreparably injured.

37.   Based upon the facts alleged hereinabove, PURE is entitled to an order from this court enjoining and restraining FALKEN and its agents and employees from the further commission of any of the sort of defamatory acts outlined above.

38.   PURE has no adequate remedy at law for the pattern of conduct currently being engaged in and threatened by FALKEN, and if FALKEN is permitted to continue this pattern of conduct and behavior unabated, PURE will continue to suffer irreparable damage.

## FOURTH CAUSE OF ACTION
### (Trade Libel)

39.   PURE realleges each and all of the allegations contained in Paragraphs 1-38, inclusive.

14

40.     Commencing in October of 2005, FALKEN willfully conspired with non-party NICKEL and non-party GOUIRAN, without justification or privilege, to publish untrue and disparaging statements about PURE to its shareholders and the interested business public at large. See Press Releases dated October 24th, October 26th and December 3rd, appended hereto as Exhibits "C," "D," and "E," respectively and incorporated hereat by this reference.

41.     These statements constitute actionable defamation, and additionally constitute express or implied breaches of the Axen License Agreement and/or the implied covenant of good faith and fair dealing associated therewith.

42.     As a proximate result of these conspiratorial and willful publications, existing and prospective customers and shareholders have been deterred from doing business with PURE, and PURE has suffered damages thereby in an amount exceeding $1,000,000.00, the exact amount of which will be proved at time of trial.  FALKEN's alleged actions are malicious, oppressive and fraudulent such that this Court should enter an exemplary / punitive award against FALKEN to punish and deter.

## FIFTH CAUSE OF ACTION
### (Declaratory Relief Re Axen License Agreement)

43.     PURE realleges and incorporates herein by reference each and all of the allegations set forth in paragraphs 1 through 42, inclusive.

44.     An actual controversy has arisen and now exists in that FALKEN contends that it remains entitled to use, sell, market and manufacture the Licensed Technology and Licensed Products i.e. containing Axenohl® or Axen®, and that it can prevent others, including PURE from so doing or alternatively receive damages from PURE or others based on claimed breaches of the Axen License Agreement.  PURE contends that the Axen License Agreement is void *ab initio* as a result of fraud in the inducement (by GOUIRAN and NICKEL), terminated by virtue of material breach, and/or expired by its terms.

15

45.   A judicial determination of the respective rights and obligations of the parties under the Axen License Agreement is necessary and appropriate to resolve the foregoing controversy.

**WHEREFORE,** Plaintiff prays as follows:

1.   For a compensatory damage award in an amount accordingly to proof, but at any rate in excess of $1,330,000.00;

2.   For an award of exemplary / punitive damages in an amount according to law and proof so as to deter continued malicious and bad-faith conduct by Defendant;

3.   For an order determining the Parties' rights and obligations under the Axen License Agreement;

4.   For an order enjoining continued trade defamation by FALKEN against PURE;

5.   For interest, costs and fees according to law and proof; and

6.   For any other relief determined to be appropriate by the Court.

Respectfully submitted,

DATED: December 16, 2005

CHARLES E. BRUMFIELD,
Attorney for PURE

16

**Complaint**



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

MEDICAL
SERVICES
a NASDAQ company

This License Agreement [the "Agreement"], is made, entered into and effective as of January 10th 2003 ["Agreement Date"], by and between Innovative Medical Services ["INNOVATIVE"], a California corporation, having its principal place of business at 1725 Gillespie Way, El Cajon, CA 92020, and Nickel, Ltd., a New Jersey corporation, with its principal place of business at 146 rue du Chateau, 75014 Paris, France ["LICENSEE"].

### RECITALS

INNOVATIVE is the owner and/or assignee of patents and certain technology [collectively the "Licensed Technology"], as defined below;

LICENSEE desires to obtain certain limited exclusive and limited non-exclusive licenses to use, sell, and market the Licensed Technology and the Licensed Products in a specified territory;

INNOVATIVE is willing to grant non-transferable limited licenses for the Licensed Technology and the respective Licensed Products to LICENSEE on the terms set forth herein; and

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto expressly agree as follows:

### DEFINITIONS

The term "Licensed Technology" shall mean silver di-hydrogen citrate (hereinafter "Axen"), a silver ion product with marketable disinfectant properties, the subject of United States Patent No. 6,197,814; WIPO App. No. WO 99/18790; together with all trade secrets as defined in California Civil Code section 3426.1 and the case law interpreting such section, unpatented inventions, all patents pending, filed or granted in the United States and in all other countries, know-how and other rights, related to said patents.

The term "patent rights" as used herein, shall, in addition to U.S. Patent No. 6,197,814, include all, renewals, reissues and foreign counterparts thereof.

The term "Licensed Product(s)," shall mean "Axen," at a 30 ppm diluted strength of the patented concentrate.

The term "Wet Wipes" shall mean an application product substantially similar to LICENSEE's current line of Clean Plus® wipe products as of the date of this Agreement.

The term "Liquid and Spray" shall mean an application product substantially similar to INNOVATIVE's current CleanKill 30™ liquid or spray product at 30 ppm concentration.

The term "know-how" shall mean all factual knowledge and proprietary information pertaining to the Licensed Technology and used or useful in the

development, production or manufacture of the Licensed Products utilizing the Licensed Technology normally held in the industry as trade secrets or otherwise as confidential information, including without limitation, all pharmacological, clinical, chemical, biochemical, toxicological, manufacturing, business, financial, formulation and scientific research data or information, whether or not capable of precise description.

The term "Licensed Territory" shall be as defined as granted in Exhibit A.
The term "Major Field of Use" shall mean a general field of business. Within this category are "Minor Fields of Use" that reflect related sub-categories of businesses with similar purchasing needs.

The term "Improvements" shall mean and include any and all patentable or non-patentable additions, alterations, modifications, design changes, and other improvements to the Licensed Products which are individually developed by INNOVATIVE, or jointly developed by INNOVATIVE, LICENSEE, and/or any third party at any time during the term of this Agreement.

The term "Confidential Data and/or Information" shall mean all transferable technical information, including but not limited to, data, reports, programs, methods, tapes, recorded notes, computer-generated data, Cad-Cam drawings, regulatory submittals, tests, studies, and other written documents or computer programs, and any and all information embodied in a tangible form relating to the Licensed Technology or

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

Licensed Products licensed pursuant to this Agreement and disclosed to the non-transferring party in tangible form. Such technical information, data, and other items referenced in the preceding sentence shall be deemed to be "confidential" within the meaning hereof when, and so long as, it relates to the Licensed Technology or Licensed Products and applications thereof; is not in the possession of the transferring party without binder of secrecy prior to the disclosure thereof except in the event same is wrongfully obtained by, or wrongfully disclosed to, the transferring party; or is not then and does not become part of the public knowledge and literature through the fault of the transferring party; or is not thereafter received from a third party other than an affiliate without binder of secrecy.

The term "affiliate, affiliates or subsidiaries" shall mean any corporation, partnership, joint venture or other entity of which the common stock or other equity ownership thereof is ten percent (10%) or more owned by LICENSEE.

The term "best efforts" shall mean that the obligated party is required to make continuing diligent and good faith efforts to accomplish the applicable objective.

The term "parties" shall mean INNOVATIVE and LICENSEE.

## GRANT OF LICENSE

INNOVATIVE hereby grants to LICENSEE two unique and separate Licenses as to the Licensed Territory only:

(1) A limited exclusive, non-transferable, right and license to the Licensed Technology for Wet Wipe as Hard Surface Disinfectant/Cleansing products only. This license allows Wet Wipe manufacture, distribution, marketing and selling of Wet Wipe products utilizing the Licensed Product(s).

(2) A limited non-exclusive, non-transferable, right and license to the Licensed Technology for a Liquid and Spray as Hard Surface Disinfectant/Cleansing products only. This license allows "Liquid and Spray" manufacture, distribution, marketing and selling of "Liquid and Spray" products utilizing the "Licensed Product(s)."

(3) The above licenses are authorized for the following Major and Minor Fields of Use categories:
   i.  Healthcare

        1.  Hospitals
        2.  Doctor's offices
        3.  Clinics
        4.  Institutions
   ii.  Educational/Childcare facilities
        1.  Institutions
        2.  Penal
        3.  Mental
   iii.  Hospitality
        1.  Hotels
        2.  Restaurants
        3.  Transportation
   iv.  Food Processing
   v.  Military

In order for LICENSEE to retain exclusive and/or non-exclusive licenses in the Major and Minor Fields of Use categories delineated above, LICENSEE must launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement. LICENSEE will launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year.

INNOVATIVE shall, at all times, retain the right to:
(i)   Use the Licensed Technology and Products for its business needs;
(ii)   Use the Licensed Technology and Products for additional research purposes; and
(iii)   Grant non-exclusive licenses and other rights to the Licensed Technology and Products to third parties, whether such be commercial entities, academic institutions or other persons.

Testing Requirements for Newly Developed Products
LICENSEE is required to ensure that INNOVATIVE shares in the results of the testing for new products. Specifically, INNOVATIVE will be included as a beneficiary on all reports from testing laboratories destined for product support or regulatory approval.

Price and Payment
Products will be sold by INNOVATIVE to LICENSEE at the prices established by INNOVATIVE from time-to-time. INNOVATIVE is entitled to change its prices at any time by giving 30-days written notice to LICENSEE specifying newly established purchase terms and/or conditions. Unless otherwise agreed to in writing, LICENSEE will arrange, in advance of shipment of Licensed Product, for payment by letter of credit.

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

If a credit account is established with INNOVATIVE for LICENSEE, LICENSEE will pay invoices within 30 days ex factory inclusive of shipping, handling, fees, taxes and tariffs. LICENSEE will pay interest on any overdue invoice amount at the rate of 1-1/2 percent per month (or the highest rate allowed by law, whichever is less), said interest to be compounded monthly.

### MARKETING OF LICENSED PRODUCTS AND TRAINING

**Due Diligence By LICENSEE.**
On a "best efforts" basis, LICENSEE shall use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable.

**Training and Assistance.**
INNOVATIVE shall upon written request and at the expense of LICENSEE, furnish and provide to LICENSEE and its employees, all reasonable technical assistance, literature, manuals, materials, catalogues, descriptive literature, information and data pertinent to the Licensed Technology and reasonably necessary for the exploitation of the License by LICENSEE, but in no event shall this obligation be construed to include any obligation to divulge the formula and/or manufacturing secret(s) of Axenohl.

**Notice of Improvements.**
During the term of this Agreement, LICENSEE shall give written notice ["Improvement Notice"] to INNOVATIVE within thirty (30) days of any actual or constructive reduction to practice of any Improvement made to any of the Licensed Technology or Licensed Products and/or know-how by LICENSEE's employees, agents and officers. Said LICENSEE Improvements shall be owned solely by INNOVATIVE, which shall have the right to seek, obtain, enforce and defend any and all intellectual property protection therefore in its own name, and in its sole discretion.

**New Patents.**
A new patent, patent pending, trademark or other intellectual property protection derived or derivable from any improvement over inventions covered by the Licensed Technology shall be deemed owned exclusively by INNOVATIVE.

**Compliance With Laws**
LICENSEE will honestly, faithfully, and strictly comply with all applicable federal, state and local laws. LICENSEE expressly indemnifies and agrees to defend INNOVATIVE and/or its shareholders, officers and agents regarding any civil, administrative, or criminal claims made as a result of LICENSEE's alleged violation of this paragraph.

### LICENSING FEE AND ROYALTY PAYMENTS.

**Licensing Fee.**
As consideration for the rights conveyed by INNOVATIVE to LICENSEE under this Agreement, LICENSEE shall pay to INNOVATIVE a licensing fee in the amount of $300,000.00 USD (waived), payable upon execution of this Agreement.

THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable over a period of eighteen (18) months, in twelve (12) equal monthly installments in the amount of $25,000 USD, commencing on the seventh (7th) month from the anniversary date of the execution of the this Agreement and continuing on a successive monthly basis through the eighteenth (18th) month from the anniversary date of the execution of the this Agreement.

**Running Royalty Payment.**
In addition to the foregoing licensing fee, for the rights, privileges and license granted hereunder, LICENSEE shall pay to INNOVATIVE a royalty payment equal to (waived) percent (___%) of the actual Gross Sales in the first year, and thereafter equal to (waived) percent (___%) of the actual Gross Sales.

**Reimbursement for Research and Development.**
LICENSEE shall pay to INNOVATIVE a research and development fee in the amount of (waived) payable upon certain milestones as defined in Exhibit A (waived).

**Marketing / Advertising Requirement.**
To ensure the products developed and produced utilizing Axen as an active ingredient have proper exposure, LICENSEE must spend 5% of the gross revenues of the Licensed Products on the marketing and advertisement of all Licensed Products within the licensed Territory.
Licensee will report monthly on required expenditures for advertising and marketing. to include examples of said advertising and marketing product.

**Payments of Licensing Fees And Royalty Payments.**
All licensing fee payments and royalty payments due hereunder are expressed in and shall be paid by check

CONFIDENTIAL LICENSING AGREEMENT
BY AND BETWEEN INNOVATIVE MEDICAL SERVICES
AND NICKEL LTD.
PAGE 3

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

payable in United States of America currency, without deduction of exchange, collection or other charges, to INNOVATIVE, or to INNOVATIVE's account at such bank as the INNOVATIVE may from time to time designate by notice to LICENSEE within ten (10) days from the due date. In the event that any payment due hereunder is not made when due, the payment shall accrue interest beginning on the tenth day following the due date thereof, calculated at the annual rate of the sum of (a) two percent (2%) plus (b) the prime interest rate quoted by The Wall Street Journal on the date said payment is due, the interest being compounded on the last day of each calendar month, provided, however, that in no event shall said annual interest rate exceed the maximum legal interest rate for corporations. Said interest and the payment and acceptance thereof shall not negate or waive the right of the INNOVATIVE to seek any other remedy, legal or equitable, to which it may be entitled because of the delinquency of any payment.

### Responsibility for Fees

LICENSEE is responsible for payment of all tariffs, fees and taxes related to the development, marketing, and/or sales of LICENSEE's products.

### Security Interest

In the event INNOVATIVE provides financing or guarantees the financing of any Licensed Products sold to LICENSEE, LICENSEE grants INNOVATIVE a security interest in all Licensed Products and in all proceeds from LICENSEE's sale of Licensed Products as security for payment of all indebtedness owed to or guaranteed by INNOVATIVE. LICENSEE agrees to execute and deliver any documents INNOVATIVE requests in order to legally perfect INNOVATIVE's security interest, including formal security agreement(s) and/or UCC-1 financing statements.

### RECORDS, REPORTS, AUDIT AND INSPECTION RIGHTS

### Maintenance of Records.

LICENSEE shall maintain or cause to be maintained, for a minimum of two (2) years, proper records and books of account relating to its activities under this Agreement.

### Timing and Content Of Reports.

LICENSEE will provide written reports to INNOVATIVE quarterly within thirty (30) calendar days after the close of each fiscal quarter. Each report shall state the customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months. With each report, LICENSEE will provide the certification from its Chief Financial Officer that the calculations are correct and have been executed in compliance with this License Agreement.

### Payments.

Concurrently with the making of each report required, LICENSEE will pay to INNOVATIVE the royalty payments at the rate specified.

### Royalty Accounting Records.

LICENSEE will keep records showing the Licensed Products distributed and sold and such records to be in sufficient detail to enable the royalties payable to INNOVATIVE to be determined. LICENSEE will also permit its books and records to be examined from time to time as provided above to the extent necessary to verify the reports provided, such examination to be made at the expense of INNOVATIVE by an independent auditor appointed by INNOVATIVE, who shall report to INNOVATIVE thereupon. In the event that the royalties due are determined by the independent auditor to be more than 5% greater than the actual royalties paid any fiscal quarter, LICENSEE shall remit the difference and promptly reimburse INNOVATIVE for the costs of the audit. Upon termination of this Agreement for any reason, INNOVATIVE shall have the right to have a final audit conducted by an independent auditor appointed by INNOVATIVE.

### Audit Procedures.

INNOVATIVE will have the right at any reasonable time or times, to cause a third party independent auditor not engaged on a contingency basis and approved by LICENSEE (not to be unreasonably withheld) to inspect and audit the books and records of LICENSEE in order to verify the contents of the reports required by this Agreement. Any such audit (i) shall be conducted after reasonable prior notice, during normal business hours and at the location(s) where such books and records are normally kept and (ii) may not be conducted more than once in any given six (6) month period. Notwithstanding the foregoing, in the event that any such audit results in a correcting payment, INNOVATIVE shall have the right to conduct up to two (2) such audits in the subsequent period. Such audit and the results thereof shall be confidential, except for use, subject to reasonable protective orders to which the parties shall stipulate, in connection with proceedings to compel a correcting payment as set forth. The auditor shall provide a copy of such report to LICENSEE

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

concurrently with reporting to INNOVATIVE.

### PATENTS, TRADEMARKS, COPYRIGHTS AND INFRINGEMENT

**Patents, Trademarks & Copyrights**
INNOVATIVE makes no representation or warranty as to whether Licensed Product or any other product infringes or will infringe upon any patent or other proprietary right which any person or organization holds or may hold in the future.
LICENSEE acknowledges the validity of all trademarks, copyrights or other related proprietary rights which INNOVATIVE holds or may hold in the future with respect to the Licensed Product. LICENSEE shall not adopt any of said INNOVATIVE trademarks, or any trademark confusingly similar thereto, or use such trademarks without the prior written approval of INNOVATIVE.

**Ownership of Trade Names and Marks**
The INNOVATIVE name and the associated trademarks (and the copyrights of all materials created by INNOVATIVE or used in connection with the Licensed Products) are and will remain the property of INNOVATIVE. LICENSEE will use trade names, marks and logos only as directed or approved in writing by authorized INNOVATIVE personnel, and will promptly institute any changes requested by INNOVATIVE. LICENSEE will not, during or after the term of this Agreement, adopt any trade name, trademark, service mark or logo, which is similar to or likely to be confused with any names or marks used by INNOVATIVE. LICENSEE will immediately notify INNOVATIVE of any claims or complaints made by third Parties related to names or trademarks of INNOVATIVE and will permit (but not obligate) INNOVATIVE to assume the defense of any action against LICENSEE in connection with such names or trademarks.

**Warranty of Title by INNOVATIVE.**
INNOVATIVE warrants that it has good and marketable title, and all rights necessary to grant the licenses and rights herein granted, to the patents licensed hereunder.

**Patent Maintenance by INNOVATIVE.**
INNOVATIVE shall maintain each of its patents licensed hereunder in all jurisdictions in the Territory in which they or equivalents have been filed, for the term of the Agreement. To the degree necessary, LICENSEE agrees to cooperate in connection with INNOVATIVE's maintenance of its patents licensed hereunder and to take any and all actions necessary to transfer the necessary documents and rights required

for, and to do such other things as are from time to time necessary to comply with the requirements of, this Section.

**Notice of Infringement And Initiation Of Action.**
LICENSEE shall promptly inform INNOVATIVE of any suspected infringement of any claims in the patent rights or misuse, misappropriation, theft or breach of confidence of other proprietary rights in the Licensed Technology by a third party.

**Effect of Invalidation.**
In the event that any of the patents licensed hereunder are invalidated by a final judgment of a court of proper jurisdiction royalties will cease for that jurisdiction, but no refunds of royalties paid under this Agreement prior to the date of invalidation will be due.

### REPRESENTATIONS AND WARRANTIES

**Mutual Representations.**
Each party represents and warrants that (i) it is a corporation in good standing under the laws of the state of its incorporation; that (ii) it has the authority to enter into this Agreement; that (iii) it has obtained all corporate approvals necessary to enter into this Agreement; that (iv) this Agreement is valid and binding and enforceable in accordance with its terms; and that (v) its execution, delivery, and performance of this Agreement will not infringe upon the rights of any third party or violate the provisions of any agreement to which it is a party.

**Reliance on Warranties, Disclaimers and Limitations.**
The Licensing Fee and Royalty Payments for the Licensed Technology and Licensed Products and the substance of the other rights and duties of LICENSEE and INNOVATIVE in this Agreement, have been negotiated in reliance on, and are based upon the applicability and enforceability of the warranties, limitations and disclaimers contained herein.

**Limited Warranties as to Licensed Products.**
Other than as specifically set forth, INNOVATIVE makes no warranties or representations, expressed or implied, including, but not limited to, warranties of fitness or merchantability, regarding or with respect to the Licensed Products.

**Disclaimers by INNOVATIVE.**
Other than the product warranties and specifications specifically set forth above, neither INNOVATIVE, nor any of its officers, employees, directors,

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

researchers, trustees, or agents assume any responsibility for the manufacture, product specifications, sale or use of the Licensed Technology or the Licensed Products, which are sold by LICENSEE.

### TERM AND TERMINATION

This Agreement shall take effect as specified, and shall continue in effect for the term of One Year. Thereafter, and at the option of the LICENSEE upon sixty days written notice, this Agreement shall be extended in one year increments to a maximum of Five years. This LICENSEE option to extend is expressly conditioned upon the LICENSEE having remained in timely and strict compliance with the expressed and implied terms of this Agreement, and upon the LICENSEE meeting the following minimum threshold AXEN purchases: (i) $600,000.00 USD purchased and fully paid for in the first 12 months (ii) $1,600,000.00 USD purchased and fully paid for by the end of year 2 (iii) a total of $3,000,000.00 USD purchased and fully paid for by the end of year 3 (iv) a total of $4,200,000.00 USD purchased and fully paid for by the end of year 4.

In the event of default or failure by LICENSEE to perform any of the terms, covenants or provisions of this Agreement, LICENSEE shall have thirty (30) days from notice to correct said default. If such default is not corrected within the said thirty (30) day cure period, INNOVATIVE shall have the right, at its option, to cancel and terminate this Agreement.

At the date of any termination of this Agreement for breach by LICENSEE, or as of the receipt by LICENSEE of notice of such termination, LICENSEE shall immediately cease using any of the Licensed Technology and return all Licensed Products to INNOVATIVE; provided, however, that LICENSEE may dispose of any Licensed Products actually in the possession of LICENSEE prior to the date of termination, subject to LICENSEE's paying to INNOVATIVE the running balances in accordance with this Agreement and otherwise complying with the terms of this Agreement.

No termination of this Agreement shall constitute a termination or a waiver of any rights INNOVATIVE has against LICENSEE accruing at or prior to the time of such termination.

In addition to any and all other remedies available to INNOVATIVE under law or equity, any of the events specified below shall immediately, upon written notice by INNOVATIVE, terminate this Agreement. The events of LICENSEE, the occurrence of which shall constitute termination for cause are as follows: (a) Sells Products outside the Licensed Territory; (b) remains in default of any payment obligations to INNOVATIVE after 30 days written notice of breach by INNOVATIVE; (c) develops, sells, leases, rents or otherwise promotes equipment, products or supplies of another manufacturer which are similar to or which compete with any of the products; (d) continues in material violation of any other term or condition of this Agreement, or engages in any conduct which is detrimental to the INNOVATIVE name or its Patents, trademarks or other Intellectual Property rights; (e) Purports to transfer its rights under this Agreement or transfers the beneficial ownership or control of its business; and/or (f) becomes the subject of a bankruptcy proceeding, makes a general arrangement with creditors, has a receiver appointed, becomes insolvent, goes into liquidation, or becomes, in INNOVATIVE' reasonable judgment so financially unstable that it would be in the best interest of INNOVATIVE to terminate this Agreement; (g) directly or through any agent perpetrates fraud upon INNOVATIVE or any INNOVATIVE customer(s) in the course of this Agreement. Neither party shall by reason of the termination of this Agreement be liable to the other for compensation of damages on account of the loss of present or prospective profits, or commissions on sales or anticipated sales, or expenditure, investments, or commitments made in connection therewith, or in connection with the establishment, development or maintenance of the selling representation hereunder. This shall not be deemed to constitute a waiver of any other claim which INNOVATIVE may have against the LICENSEE; and provided further, that the acceptance of any sales order by INNOVATIVE after the termination of this Agreement shall not be construed as a renewal of extension of this Agreement or as a waiver of termination.

### GOVERNMENTAL COMPLIANCE

During the term of this Agreement, LICENSEE shall, at all times, comply with all laws that may control the manufacture, use, sale, marketing, distribution and other commercial exploitation of the Licensed Technology and Licensed Products or any other activity undertaken pursuant to this Agreement.

### GOVERNING LAW AND DISPUTE RESOLUTION

Governing Law and Dispute Resolution. The laws of the state of California govern this Agreement, without reference to any conflict of laws provision(s). All disputes and controversies related to this Agreement and the transactions contemplated by this Agreement whether sounding in tort or contract shall

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

be determined exclusively by binding mediation/arbitration ("med/arb") in accordance with the then current commercial dispute procedures of the American Arbitration Association, and will be conducted only in the county of San Diego, California. The arbitration shall be "self-executing," such that no order to compel by any court is necessary to enforce compliance with the terms of this paragraph against a party who declines to voluntarily participate in the AAA procedure. Should one of the parties fail to respond to a request to arbitrate or otherwise decline to participate in the procedure, the AAA administration shall appoint a neutral arbitrator who is empowered by this paragraph to entertain evidence from the participating party and enter a binding award accordingly. The Parties expressly submit to the jurisdiction of said San Diego arbitrator, and voluntarily waive any right to assertion of the principle of "inconvenient forum." The Parties waive any rights either might otherwise have to consequential, multiple or punitive damages. The Parties each expressly forever waive any right to trial by jury, or to any appeal of the arbitrator's decision. The prevailing party in any such dispute shall be entitled to attorneys' fees and costs at the discretion of the arbitrator, and the award of the arbitrator may be rendered as a judgment by any San Diego based state or federal court.

### CONFIDENTIALITY

Confidentiality.
LICENSEE agrees to maintain the Licensed Technology in confidence, and to use the same only in accordance with this Agreement. The foregoing obligation of confidentiality shall survive termination of this Agreement.

Terms Confidential and Employee Instruction.
The terms of this Agreement shall be confidential and shall not be disclosed to any person or entity not a party to this Agreement, except the disclosing party's attorneys, accountants, and investors who are bound by the confidentiality provisions set forth herein, unless prior written consent is obtained from the other party, or unless a court or administrative agency of the United States or a state thereof orders such disclosure, provided, however, that in the event that such disclosure is required, the parties will use good faith efforts to maintain the confidentiality of any terms of this Agreement which are not so required to be disclosed. Furthermore, each of the parties agrees to instruct its respective employees as to the confidentiality of this Agreement.

### SHIPMENT

Shipment
Products will be shipped F.O.B. / Ex-factory from INNOVATIVE's designated manufacturing or warehouse facility. INNOVATIVE will not be liable for any delay in shipment or other damage suffered by LICENSEE from any cause beyond INNOVATIVE's reasonable control. INNOVATIVE will retain title to all Products until it receives payment, but LICENSEE will bear all risks of Product casualty or loss and any expense related thereto from the time Products are delivered by INNOVATIVE to the carrier for shipment to LICENSEE. LICENSEE acknowledges that it is hereby advised by INNOVATIVE to purchase insurance to protect itself from this assumed risk of loss. LICENSEE must make claims for any damages that are apparent at the time of delivery within 3 business days in writing to the shipper and to INNOVATIVE; all other claims for damaged goods or LICENSEE must make shortages in writing within five business days after receipt of shipment.

Returns
LICENSEE shall not be entitled to return any conforming Licensed Products to INNOVATIVE without INNOVATIVE's prior written consent. Any Licensed Products returned to INNOVATIVE must be in its original sealed container, unopened and unused, with all accompanying documentation intact, and must be Licensed Products that INNOVATIVE continues to carry in its inventory. Should INNOVATIVE determine to grant permission to the LICENSEE to return Licensed Product, LICENSEE will pay a minimum 15 percent restocking charge on any Products returned to INNOVATIVE, and will pay all associated shipping, tax and tariff costs.

Excusable Delay
INNOVATIVE will not be liable for any failure or delay in the delivery of Licensed Products due to circumstances beyond its reasonable control, such as natural catastrophe, fire, war, riot or civil unrest, strike, lockout or other labor disturbance, shortage or unavailability of materials, components or transportation facilities, or any act, refusal to act, regulation, order or intervention of governmental authorities.

### INSURANCE

Insurance.
LICENSEE shall for so long as LICENSEE manufactures, uses or sells any Licensed Product(s), maintain in full force and effect policies of (i)



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

worker's compensation and/or employers' liability insurance within statutory limits, (ii) general liability insurance (with broad form general liability endorsement) with limits of not less than ten million dollars ($10,000,000.00 USD) per occurrence with no annual aggregate and (iii) products liability insurance, with limits of not less than two million dollars ($2,000,000.00 USD) per occurrence with no annual aggregate. Such coverage(s) shall be purchased from a carrier or carriers deemed acceptable to INNOVATIVE with no annual aggregate and shall name INNOVATIVE as an additional insured. LICENSEE shall provide to INNOVATIVE copies of said policies of insurance.

### GENERAL TERMS AND CONDITIONS.

**Entire Agreement.**
This Agreement memorializes and constitutes the final expression and the complete and exclusive statement of agreement and understanding among the parties with regard to the subject matter hereof. All negotiations, agreements, proposed agreements, covenants, representations and warranties, express and implied, oral and written, of the parties with regard to the subject matter hereof are contained herein (except as to any letter agreement executed concurrently herewith). No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by either party to the other with respect to the subject matter of this Agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements and representations, covenants, and warranties with respect to the subject matter hereof are waived, merged herein and superseded hereby. This is an integrated agreement.

**Indemnification.**
LICENSEE agrees that it will defend, indemnify and hold harmless the INNOVATIVE, its faculty members, scientists, researchers, employees, officers, shareholders, attorneys, trustees, directors, and agents and each of them (the "Indemnified Parties"), from and against any and all claims, causes of action, lawsuits or other proceedings filed or otherwise instituted against any of the Indemnified Parties related directly or indirectly to or arising out of the design, process, manufacture, or use by any person or party of the Licensed Technology, the Licensed Technology or any other embodiment of the Licensed Technology even though such claims, causes of action, lawsuits or other proceedings and the costs (including attorney's fees) related thereto result in whole or in part from the negligence of any of the Indemnified Parties. Notwithstanding any provisions

herein to the contrary, the INNOVATIVE shall indemnify LICENSEE for any claims for injuries to persons or property damage which occur on the INNOVATIVE premises or premises under the exclusive control of the INNOVATIVE. LICENSEE will also assume responsibility for all costs and expenses related to such claims and lawsuits for which it is obligated to indemnify the Indemnified Parties pursuant to this Paragraph, including, but not limited to, the payment of all reasonable attorneys' fees and costs of litigation or other defense.

**No Agency or Legal Representative Status.**
The parties are and at all times shall be and remain independent contractors as to each other. No joint venture or other relationship which would impose liability upon either party for any act or failure to act of the other party shall be created or implied hereby or herefrom. This Agreement does not and is not intended to constitute LICENSEE as the agent or legal representative of INNOVATIVE. Except as provided herein, neither party is granted any express or implied right or authority by the other party to assume or create any obligation or responsibility on behalf of or in the name of the other party, or to bind the other party in any manner or thing whatsoever. Nothing in this Agreement shall be construed to create a relationship of joint venture, partnership, fiduciary or other similar relationship between the Parties.

**Exhibits.** The following exhibits are attached to the Agreement and incorporated by reference:
Exhibit A: Definition of Territory for Licensed Product(s)

**Attorneys' Fees and Court Costs.**
In the event that it becomes necessary to initiate legal proceedings by either party to enforce any of the terms or provisions of this Agreement, to recover damages, or to obtain any relief, at law or in equity, the prevailing party shall be entitled to recover, in addition to any relief afforded or obtained in such proceeding, reasonable attorneys' fees and costs as well as any court costs incurred by such party in connection with any such action(s).

**Waiver and Severability.**
The failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of that provision or of the right of the party to thereafter enforce that or any other provision. In case any provision of this Agreement is held to be invalid, unenforceable or illegal, the provision will be severed from this Agreement and such invalidity, unenforceability or illegality will not affect any other



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

provision of the Agreement. Any specific right or remedy contained in this Agreement shall not be exclusive, but shall be cumulative upon all other rights and remedies hereunder or otherwise allowed or allowable under applicable law.

**Representation.**
This document is the result of negotiations between parties, each of whom was represented or had the opportunity to be represented in the transaction, and has had the opportunity to have had the transactional documents reviewed by counsel of their own choice.

**No Assignment.**
This Agreement or any part thereof may not be transferred or assigned by LICENSEE without the written consent of INNOVATIVE.

**Survival of Representations And Warranties.**
The representations and warranties will survive and continue in full force and effect notwithstanding the close of escrow or early termination of this Agreement.

**Additional Documents and Acts.**
LICENSEE hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**Counterparts.**
This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

**Severability.**
In the event that any covenant, condition or other provision herein contained is held to be invalid, void or illegal by any court of competent jurisdiction the same shall be deemed severable from the remainder of this Agreement and. shall in no way affect, impair or invalidate any other covenant, condition or other provision herein contained.  If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such covenant, condition or other provision shall be deemed valid to the extent of the scope or breadth permitted by law.

**Notices.**
All notices, as well as any reports or statements, required hereunder shall be deemed to be duly given on the date same is mailed or sent and/or acknowledged via hand delivery, facsimile or reliable overnight delivery to the party concerned at the following addresses:

If to INNOVATIVE:
Innovative Medical Services
1725 Gillespie Way
El Cajon, California 92020
Attn: Michael L. Krall

If to LICENSEE:
Nickel, Ltd.
146 rue du Chateau
75014 Paris, France
Attn: Emile Gourian

**Reformation.**
All parties hereby agree that neither party intends to violate any public policy, statutory or common law, rule, regulation, treaty or decision of any government agency or executive body thereof of any country or community or association of countries; that if any word, sentence, paragraph or clause or combination thereof of this Agreement is found, by a court or executive body with judicial powers having jurisdiction over this Agreement or any of its Parties hereto, in a final unappealed order to be in violation of any such provision in any country or community or association of countries, such words, sentences, paragraphs or clauses or combination shall be inoperative in such country or community or association of countries, and the remainder of this Agreement shall remain binding upon the Parties hereto.

**Force Majeure.**
No liability hereunder shall result to a party by reason of delay in performance caused by force majeure, that is, circumstances beyond the reasonable control of the party, including, without limitation, acts of God, fire, flood, war, civil unrest, labor unrest, terrorist acts, shortage of or inability to obtain material as equipment.

**Section Headings.**
The section headings used in this Agreement are intended for convenience only and shall not be deemed to supersede or modify any provisions.

**Controlling Document**
This Agreement and its terms and conditions shall control as to any conflicts in language between this Agreement and any other agreement between the parties.



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

This Agreement shall be binding upon and shall inure to the benefit of the INNOVATIVE and its assigns and successors in interest, and shall be binding upon and shall inure to the benefit of LICENSEE and the successor to all or substantially all of its assets or business to which this Agreement relates, but shall not otherwise be assignable or assigned by LICENSEE without prior written approval by the INNOVATIVE being first obtained,

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement in multiple originals by their duly authorized officers and representatives on the respective dates shown below, but the terms hereof are effective as of the Agreement Date.

INNOVATIVE MEDICAL SERVICES

Dated: January 15 2003

By: _____
Michael L. Krall, President / CEO

NICKEL, LTD.

Dated: January___, 2003

By: _____
Emile E. Gouiran, Corporate Secretary

* * *

**NICKEL LTD (NICKEL)**
A New Jersey Corporation

AND

**INNOVATIVE MEDICAL SERVICES INC (IMS)**
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cretia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.

\* \* \*

### NICKEL LTD (NICKEL)
A New Jersey Corporation

### AND

### INNOVATIVE MEDICAL SERVICES INC (IMS)
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cretia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.

\* \* \*

NICKEL LTD (NICKEL)
A New Jersey Corporation

AND

INNOVATIVE MEDICAL SERVICES INC (IMS)
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cretia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.

**FALKEN INDUSTRIES LTD**
European Regional Office
146 rue du Château
75014 PARIS
FRANCE
Tel: +331 4542 1916
Fax. +331 4542 2337
www.cleanplus.com

Office of the Executive Vice President

September 25, 2003

Michael KRALL
President and CEO
Innovative Medical Services, Inc.
1725 Gillespie Way
El Cajon, CA 92020

Re:    Nickel exercise of IMS warrants

Dear Mr. Krall:

Please be advised that pursuant to the Umbrella Agreement and the amendment thereto, Falken Industries Ltd., as assignee of Nickel Ltd., hereby exercises its warrants for 4.75% of the fully diluted shares of Common Stock of IMS as of December 1, 2002, but not less than 525,000 shares, at a price of $.0001 per warrant. If 625,000 shares is equivalent to 5% or more of the currently outstanding shares, please advise so that we can arrange to file whatever papers are necessary with the SEC.

If you provide us with wire transfer instructions and the amount that is owed for the shares, we will wire transfer that amount to you forthwith. Any questions concerning this transaction should be addressed in the first instance to our attorneys. Lisa Fair and Michael Rovell of the Law Offices of Michael J. Rovell, 20 N. Clark Street, Suite 2450. Chicago. Illinois, 60602, tel: (312) 578-9191, fax: (312) 578-9391.

Very truly yours,

FALKEN INDUSTRIES LTD., as assignee of
NICKEL LTD

Helle A. MADSO
Executive Vice President, Strategic Planning

October 24, 2005 10:45 AM US Pacific Timezone

# FALKEN Industries Ltd Recovers Judgment of EUR 8,800,000.00

PARIS--(BUSINESS WIRE)--Oct. 24, 2005--FALKEN INDUSTRIES LTD - today announced that it had recovered a EUR 8.800.000,00 judgement against NICKEL LTD with permission to pursue by subrogation, enforcement against PURE BIOSCIENCE (Formerly INNOVATIVE MEDICAL SERVICES "IMS") (OTC:BB PURE).

Nickel, stated that it had signed its litigated supply agreement with Falken in reliance upon a contract signed by it with PURE, and that it was compelled to default with Falken as a result of PURE's continued failing or inability to deliver Axen concentrate or dilution. Nickel also stated that its total claims against PURE including for breaches of its exclusivities, exceeded EUR 38.500.000,00 ($ 46.500.000,00) in unambiguous contract claims, and that amount again in consequential damages. These claims will be pursued in three separate lawsuits.

Nickel advised today that in accord with leave granted it by the Paris High Court on March 25, 2005, it had commenced, filed and served on an accelerated basis in Paris France, the first of two lawsuits. The first suit against PURE seeks damages exceeding EUR 12,500,000 ($15.250.000,00) for lost margins on required purchases and for an additional and undetermined amount including for breaches of the non-compete provisions. The second lawsuit claiming direct damages in excess of EUR 14.500.000,00 ($ 17.690.000,00) is expected be filed and served within ten days, and documents additional claims against PURE for its managerial failures of a joint venture. Pure had admitted its contractual obligations in SEC filings, and had confirmed Nickel's exclusivities and performance of the contract in its own press release(s).

The jurisdiction of the French courts was heavily contested by PURE in an earlier court proceeding, but on March 25, 2005, the French Court ruled against PURE and confirmed its exclusive jurisdiction to adjudicate the matters and PURE did not appeal.

Attorneys representing Nickel, said :"Under the two Agreement(s) PURE is specifically prohibited from any competing activity in the United States, and required to make minimum purchases and meet development objectives in the United States all of which it has refused to do."

ABOUT FALKEN INDUSTRIES LTD

Falken Industries Ltd. Is a leading manufacturer of innovative wet wipe and other products. Its core product group is the Clean Plus(R) brand of high performance products - www.cleanplus.com through which it ensures the development and commercialisation of specialty cleaning and maintenance products for consumer and industrial applications.

Through its production associate in St Pierre les ElBeuf (FRANCE), Falken also pursues the production and development of its non-competing private label business which contributes materially to economies of scale in raw materials costs.

Clean Plus(R) Auto Care(R) is a recognized success by both clients and competitors due to its unique market positioning, high quality, and price advantage. In February 2005, the company launched its Handyman(R) product group aimed at the consumer DIY market segment.

Distribution is ensured through Falken's unique "Super Distribution" concept. Super Distribution Agreements provide successful distributors with a contractual exclusivity for a given geographic area and market segment.

Currently, the Clean Plus(R) and related product lines are sold throughout Europe and in many other countries. The company introduced its product line in the United States in November 2004, and expects to launch that market in 2006. The Company's clients include: the largest distribution networks in the automotive sector, major gasoline station chains, exclusive retail auto aftermarket chains in Europe with hundreds of stores in six European nations. The Company also sells to government agencies and a large number of national and multinational firms.

*All products are sold in multiple languages and are manufactured to service the whole of the European and North American market.* Consumer products are manufactured in different editions, i.e., NE Northern European (Finland, Norway, Sweden, Denmark and the UK); CE Central Europe (Belgium, Holland, Luxembourg and Germany); SE Southern Europe (Portugal, Spain, Italy, Greece and Cyprus); US (United States & South America) and C(Canada, and the Commonwealth Countries). Languages, versions and models are created as the company expands its Super Distribution network.

The Clean Plus(R) line of products is divided into 2 segments, the consumer line and the professional line.

This press release includes statements that may constitute "forward-looking" statements, usually containing the words "believe", "estimate", "project", "expect" or similar expressions. These statements are made, to the extent relevant, pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements inherently involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Factors that would cause or contribute to such differences include, but are not limited to, acceptance of the Company's current and future products and services in the marketplace, the ability of the Company to develop effective new products and receive regulatory approvals of such products, competitive factors, dependence upon third-party vendors, and other risks. By making these forward-looking statements, the Company undertakes no obligation to update these statements for revisions or changes after the date of this release.

**Contacts:**

FALKEN Industries Ltd
Rishard Lebbe
Assistant Vice-President Communications
Phone: +331 4542 1916
rlebbe@falkenltd.com

**Business Wire**

**Terms of Use   |   © Business Wire 2005**

October 26, 2005 04:56 AM US Eastern Timezone

# NICKEL Ltd Wins $ 15 Million Jurisdiction Litigation against PURE BIOSCIENCE

PARIS--(BUSINESS WIRE)--Oct. 26, 2005--NICKEL LTD - today announced that in accord with a March 25, 2005 court judgment in its favor authorizing suit on an accelerated basis, it has filed the first of two lawsuits against PURE BIOSCIENCE (Formerly INNOVATIVE MEDICAL SERVICES "IMS") (OTCBB:PURE). This first suit is for direct contractual damages exceeding $15 million and for an equal amount in unspecified damages.

Nickel, stated that its total claims against PURE, which include allegations for (i) breaches of Nickel's exclusive rights to commercialize Axen, an Axenohl derivative, (ii) breaches of PURE's agreement not to compete in the US and in Europe, (iii) and breaches of PURE's fiduciary responsibilities in the management of a joint venture, and (iv) other direct contract claims, exceed EUR 38.500.000,00 ($ 46.500.000,00) in direct contract claims, and that amount again in other damages. Nickel recently suffered a judgment against it for EUR 8,800, 000.00 ( $ 10,736,000.00) in favor of Falken Industries Ltd for damages resulting from its inability to deliver under a supply agreement with Falken, which it said was a direct consequence of PURE's refusal or inability to deliver to it.

PURE's contractual obligations to Nickel appear in SEC filings - see 10QSB 17 March, 2003 and 10QSB 16 June 2003. Both the filings and PURE's press releases are public records submitted in the suit. Under one of the three contracts, PURE is also liable to deliver to Nickel nearly 800.000 shares of PURE common stock.

The jurisdiction of the French courts was heavily contested by PURE, but on March 25, 2005, the French Court ruled against PURE and confirmed its exclusive jurisdiction to adjudicate two of the matters and PURE did not appeal. The contracts were negotiated and signed in Paris, France. The French Court further granted leave to proceed on two lawsuits on an accelerated basis in the trial part. Attorney's for Nickel stated : "Such leave is generally interpreted to signify the court's belief that a case is meritorious."

Attorneys for Nickel also stated :"Under two Agreement(s) PURE is specifically prohibited from any competing activity in the United States, and required to make minimum purchases and meet development objectives in the United States, all of which it has refused to perform."

ABOUT NICKEL LTD

Nickel Ltd is an investor in intellectual properties, product engineering and marketing.

**Contacts:**

Nickel Ltd
Srdjan Ristic
sristic@nickelltd.com



**PRWeb**™
PRESS RELEASE
N E W S W I R E

# Nickel Ltd perfects Hague Convention Service of $ 22 million claim against Pure Bioscience

*Nickel Ltd today announced confirmation from the Ministry of Justice of perfected service under the Hague Convention of the second lawsuit against Pure Bioscience (Formerly Innovative Medical Services "IMS") OTC:BB PURE. This second suit is for direct contractual damages exceeding $22 million and will seek other, additional consequential and ancillary damages.*

Paris, France (PRWEB) December 3, 2005 -- Nickel Ltd – today announced confirmation from the Ministry of Justice of perfected service under the Hague Convention of the second lawsuit against Pure Bioscience (Formerly Innovative Medical Services "IMS") OTC:BB PURE. This second suit is for direct contractual damages exceeding $22 million and will seek other, additional consequential and ancillary damages.

A first suit seeking $ 15 million in contractual damages is ongoing.

Attorneys representing Nickel stated :

"This lawsuit is the second of three suits to be initiated arising out of various conflict which we believe are the product of Pure's questionable intentions from the outset of the relationship. Evidence suggests that Pure's only purpose for engineering the agreements with Nickel was a need to buttress its declining stock quotation through leaks and subsequent news releases.

Pure's egregious disregard for contractual obligations, appears to be a modus opendi in support of a tactic known as pump and dump. It contracts, leaks information, announces the deal, manipulates its stock quotation, and brings or provokes suit to extract itself from the commercial relationship and extort settlements.

Noteworthy on this point is the company's organizational structure. It has 11 employees one of which is a full time staff litigator, another of which is a para-legal, it has no marketing or sales department, no business activity to speak of and purported annual revenues of at most $ 150,000. Throughout its existence it has incurred systematic losses of several million dollars each year. Yet, undeterred it violently dilutes shareholder equity by covering a large amount of its expenses, reportedly including executive and other reportedly disproportionate compensations by the issuance of options and shares, in a never ending cycle to fuel the need for news to prime the pump and strategies ensuring key officer cash outs.

Semantics and disingenuous commentary, tortuous and self-serving misinterpretations, alleged cease and desists, and inaccuracies, appear regularly in PURE's SEC filings and Press Releases alike."

Nickel, stated that its total claims against Pure, which do or will in a forthcoming third proceeding include allegations for (i) breaches of Nickel's exclusive rights to commercialize Axen, an Axenohl derivative in Europe and the United States, (ii) breaches of Pure's agreement not to compete in the US and in Europe, (iii) and breaches of Pure's fiduciary responsibilities in the management of a joint venture, and (iv) other direct contract claims, exceed $ 47.500.000,00 in direct contract claims, and that amount again in other damages.

Pure's admission of its multi-million dollar contractual liability to Nickel appear in SEC filings – see 10QSB 17 March, 2003 and 10QSB 16 June 2003. Under one of the three contracts, Pure is also liable to deliver to Nickel nearly 800.000 shares of Pure common stock as at its value on March 11, 2003 exposing Pure to $

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Please do not contact PR Web. We will be unable to assist you with your inquiry. PR Web disclaims any content contained in these releases. Our complete disclaimer appears here.*



**PRWeb™**
PRESS RELEASE
N E W S W I R E

368,000 in additional damages based on today's trading price.

On March 25, 2005, the French Court ruled against Pure and confirmed its exclusive jurisdiction to adjudicate two of the matters and PURE did not appeal. The French Court further granted leave to proceed on two lawsuits on an accelerated basis in the trial part. Attorneys for Nickel stated : "Such leave is generally interpreted to signify the court's belief that a case is meritorious."

Nickel also advised that it and its attorneys are considering participating in a series of additional lawsuits against Pure and its officers and agents with other parties, and considering a class action. These claims aggregate in excess of $ 100 million all or many of which will be filed shortly some before the end of this year.

Attorneys for Nickel concluded: "Under two of the Agreement(s) Pure is specifically prohibited from any competing activity in the United States, and required to make minimum purchases and meet development objectives all of which it has refused to perform. In our view, the presentation and sale of Axen or Axenohl derivative products in the United States specifically competes with Nickel's disinfection product group, and as such constitutes, in the least a clear violation of the non-compete clause of the agreement."

Nickel recently suffered a judgment against it for € 8,800, 000.00 ( $ 10,736,000.00) in favor of Falken Industries Ltd for damages resulting from its inability to deliver under a supply agreement with Falken, which it said was a direct consequence of Pure's refusal or inability to deliver to it.

When contacted, Rishard Lebbe, Ast Vice President Communication at Falken advised :

"Pure has mastered the art of trompe l'oeil and gives new meaning to the adage of counting one's eggs before they are hatched. It professes for example the recovery of a $ 3,6 million arbitral award against Falken, but conspicuously omits from its disclosures in SEC filings and Press Releases, that on appeal, Pure has argued and admitted that the Federal Court compelling Falken to arbitrate even as it was a non-signatory to the arbitral clause contained in the litigious contract, was without subject matter jurisdiction. This argument supported by a decision of Chief Justice Roberts of the Supreme Court of the United States, renders the order compelling the arbitration, and as a consequence the award against Falken resulting there-from a complete nullity."

Falken has moved to have confirmation stayed while awaiting decision on the appeal.

About Nickel LTD
Nickel Ltd is an investor in intellectual properties, product engineering and marketing.

This press release includes statements that may constitute "forward-looking" statements, usually containing the words "believe", "estimate", "project", "expect" or similar expressions. These statements are made, to the extent relevant, pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements inherently involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Factors that would cause or contribute to such differences include, but are not limited to, acceptance of the Company's current and future products and services in the marketplace, the ability of the Company to develop effective new products and receive regulatory approvals of such products, competitive factors, dependence upon third-party vendors, and other risks. By making these forward-looking statements, the Company undertakes no obligation to update these statements for revisions or

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Please do not contact PR Web. We will be unable to assist you with your inquiry. PR Web disclaims any content contained in these releases. Our complete disclaimer appears here.*



**PRESS RELEASE**
**N E W S W I R E**

changes after the date of this release.

###

**Contact Information**
**Srdjan Ristic**
NICKEL LTD
2 222 1076

If you have any questions regarding information in these press releases please contact the company listed in the press release. Please do not contact
PR Web. We will be unable to assist you with your inquiry. PR Web disclaims any content contained in these releases. Our complete disclaimer
appears here.

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

FILED

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**05 DEC 16  PM 2: 36**

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

**I (a) PLAINTIFFS**

Pure Bioscience, a California corporation

**DEFENDANTS**

Falken Industries, Ltd., a New Jersey corporation

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** San Diego, California
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
Trenton, New Jersey

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Charles E. Brumfield, Esq. (56636)
1725 Gillespie Way
El Cajon, CA 92020
619-596-8600 x138

**ATTORNEYS (IF KNOWN)**

Joel S. Seidel, Esq. (175275)
9939 Louise Avenue
Northridge, CA 91325
818-832-7850

**'05 CV 2299    WQH BLM**

**II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)**

- 1 U.S. Government Plaintiff
- 2 U.S. Government Defendant
- 3 Federal Question
  (U.S. Government Not a Party)
- X Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)              FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | X | 1 | Incorporated or Principal Place of Business in This State | X 4 | 4 |
| Citizen of Another State | | 2 | X | Incorporated and Principal Place of Business in Another State | 5 | X |
| Citizen or Subject of a Foreign Country | | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

Breach of Contract and Trade Libel in Diversity Action
28 :1332 bc  mg

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reappointment |
| 120 Marine | 310 Airplane | 362 Personal Injury-Medical Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability | 365 Personal Injury - Product Liability | 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment &Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 640 RR & Truck | 830 Patent | 460 Deportation |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability | 370 Other Fraud | 660 Occupational Safety/Health | **SOCIAL SECURITY** | 810 Selective Service |
| 153 Recovery of Overpayment of Veterans Benefits | 350 Motor Vehicle | 371 Truth in Lending | 690 Other | 861 HIA (1395ff) | 850 Securities/Commodities Exchange |
| 160 Stockholders Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | **LABOR** | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 865 RSI (405(g)) | 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | 870 Taxes (U.S. Plaintiff or Defendant) | 894 Energy Allocation Act |
| 220 Foreclosure | 442 Employment | 530 General | 790 Other Labor Litigation | 871 IRS - Third Party 26 USC 7609 | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 535 Death Penalty | 791 Empl Ret Inc. Security Act | | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 240 Tort to Land | 444 Welfare | 540 Mandamus & Other | | | 950 Constitutionality of State |
| 245 Tort Product Liability | 440 Other Civil Rights | 550 Civil Rights | | | 890 Other Statutory Actions |
| 290 All Other Real Property | | 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

- X Original Proceeding
- 2 Removal from State Court
- 3 Remanded from Appellate Court
- 4 Reinstated or Reopened
- 5 Transferred from another district (specify)
- 6 Multidistrict Litigation
- 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23
DEMAND $ 1,330,000.00
Check YES only if demanded in complaint:
JURY DEMAND: YES   X NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE  M. James Lorenz
Docket Number 04CV2248, 04CV1147, 05CV0446, 05CV2020

DATE  December 16, 2005    SIGNATURE OF ATTORNEY OF RECORD
C E Brumfield

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PW $250.00  12/16/05 #119620  KB